418 So.2d 807 (1982)
NATURAL FATHER
v.
UNITED METHODIST CHILDREN'S HOMe, et al.
No. 53406.
Supreme Court of Mississippi.
August 18, 1982.
Noel P. Giuffrida, Ridgeland, Chet A. Henley, Jr., Jackson, for appellant.
Watkins, Ludlam & Stennis, Betty A. Morgan, Jackson, for appellees.
Before WALKER, P.J., and BROOM and ROY NOBLE LEE, JJ.
BROOM, Justice for the Court:
Parental rights (father's) termination was decreed in this cause by the Chancery Court of the First Judicial District of Hinds County, Judge Paul Alexander, Chancellor, presiding. Subject of the action are the twin sons of appellant, the natural father, presented in two separate causes which are by agreement consolidated as one cause.[1] The natural mother consented to the proceedings. Basic issues relate to (1) constitutionality of that portion of Mississippi Code Annotated § 93-15-109 (Supp. 1981), which allows parental rights termination upon a "preponderance of the evidence ...", and (2) admissibility of evidence. We reverse.
Appellant is the natural father of the twin boys, who were born October 25, 1974, just ten days after appellant's marriage to the natural mother. In 1978 the parents were divorced. The mother was granted child custody and appellant was ordered to pay child support, which he paid until January 1980, when the twins were placed in the care of the United Methodist Children's Home (UMCH herein). In July of 1979, *808 although she had legal custody of the twins, the mother surrendered their custody to their father (the appellant), and he kept the twins until he placed them in UMCH on January 4, 1980. Appellant's stated reason for placing the twins in UMCH was that he was unemployed and had no money.
Testimony of UMCH personnel was that the behavior of the twins was very bad, evidencing potential emotional problems. As a result of these behavioral difficulties, UMCH "curtailed" appellant's visitation, and two days later, on January 15, 1980, the twins were placed with a foster family. The twins remained with the foster family until some time in August of 1980. During this period of time appellant contacted UMCH on a number of occasions, both in person and by telephone, inquiring as to the twins' wellbeing.
The foster parents gave testimony at the hearing regarding the behavior of the twins during the period of time they served as foster parents. According to the foster father, the twins' behavior was replete with "gutter type" obscenities, sexually suggestive vulgarities, and was marked by extraordinarily hostile behavior directed against each other, against others, and against themselves. He testified that the twins had told him that appellant had sexually abused them. Likewise, the foster mother testified as to the hostile behavior of the children, and recounted incidents related to her by the twins to the effect that appellant had sexually abused them. During the time the twins were in the foster home, the foster parents employed Dr. Donald Matherne (a psychologist) for the evaluation and treatment of the twins, who remained under his care for approximately seven months. Dr. Matherne testified that the twins, while of normal intelligence, were functioning at a subnormal level of achievement, and that the mention of their biological father generated virtually no response whatever on the part of the twins. On the other hand, he indicated that the mention of their mother engendered extreme agitation, particularly in reference to the possibility of returning home. Dr. Matherne said that he had inquired of the twins as to the possibility of sexual abuse and testified that while he was convinced that "something of a sexual nature occurred", that he was not able to "pin them down to specifics and names and events and times and places". Dr. Matherne also indicated that appellant came by his office to inquire as to the health and well-being of the children. On the basis of this visit, Dr. Matherne indicated that he believed that appellant cared for his sons.
On May 14, 1980, appellant and his ex-wife met with UMCH officials and discussed the possibility of placing the twins for adoption. At the time of this conversation, appellant refused to consider such a possibility and the natural mother said that she would think about it. She later informed UMCH that she, too, refused. In August of 1980, the twins were removed from the care of the foster parents, and on August 22, 1980, they were released to the custody of their natural mother. On September 5, approximately two weeks later, she returned the children to UMCH and signed a statement releasing custody of the children to UMCH for the purposes of adoption.
On February 10, 1981, appellant (natural father) met with the UMCH officials, stating that he wanted either the natural mother or himself to have custody of the twins. On February 19, 1981, UMCH filed a petition for the termination of appellant's parental rights pursuant to Mississippi Code Annotated §§ 93-15-101 to XX-XX-XXX (Supp. 1981).
Dispositive of the case is the single issue: Whether the standard of proof "preponderance of evidence" which authorized the termination of parental rights under Mississippi Code Annotated § 93-15-109 (Supp. 1981) satisfies the requirements of due process as set forth in the Fourteenth Amendment of the United States Constitution. Pertinent language of § 93-15-109 is "if the chancellor is satisfied by a preponderance of the evidence ... the court may terminate" a parent's parental rights. (Emphasis added). UMCH, appellee, argues that appellant did *809 not raise this issue in the lower court, and therefore is barred from raising it on appeal for the first time.
The general rule is that questions not raised at the trial level will not be considered here as grounds for reversal. Gale v. Lancaster, 44 Miss. 413 (1870); Stewart v. City of Pascagoula, 206 So.2d 325, 328 (Miss. 1968). However, the general rule is not without exception. Williams v. Bailey, 174 Miss. 760, 165 So. 439 (1936), pointed out an exception where children's rights are involved:
[W]e must declare that, whatever the operation of that rule may be as to adult litigants, it can have no effect to stay the hands of the court when one of the principal parties litigant is a minor of tender years, and when, in the attempt to make out the proof in her behalf upon one theory, sufficient facts consistent with that theory have been developed to disclose that the minor is entitled to recover upon a different, but consistent, theory. Id. at 767, 165 So. at 441.
This exception is consistent with the fundamental concept of this state as parens patriae over an infant. It is this basic concept, derived from a fundamental concern over the protection and guardianship of the interests of minors, which has given rise to certain parallel exceptions formulated for the protection of the minor's interest. Some of these exceptions are set out in Griffith, Mississippi Chancery Practice, § 533 (2d Ed. 1950). An infant is not bound by the admissions of his guardian ad litem. Ingersoll v. Ingersoll, 42 Miss. 155, 163 (1868). As Khoury v. Saik, 203 Miss. 155, 33 So.2d 616 (1948), stated: "Minors can waive nothing. In the law they are helpless, so much so that their representatives can waive nothing for them... ." Id. at 162, 33 So.2d at 618. The extent to which this Court has gone to protect the rights and interests of minors is seen in the following language excerpted from Price v. Crone, 44 Miss. 571 (1871):
The infant is entitled to every benefit which can be taken to the bill, although no exceptions are expressly taken. His answer cannot be excepted to for insufficiency, nor can any admission made by him be binding. The rights of an infant will not be permitted by the court to be prejudiced by any omission of the guardian ad litem. (Citations omitted).
44 Miss. at 577.
Upon the facts of this case where the basic issue involves the rights and destiny of small children, we now conclude that we should face the constitutional question even though not raised at the trial level. Thus we proceed to answer the question: Does the "preponderance of the evidence" standard of proof set by the Mississippi legislature by § 93-15-109, supra, authorizing the chancellor to decree the termination of the parental rights of an unfit parent, comport with the standards of due process required by the Fourteenth Amendment of the United States Constitution?
There is no doubt that a state legislature has the power to enact laws governing the termination of parental rights. In Eggleston v. Landrum, 210 Miss. 645, 50 So.2d 364 (1951), we stated:
There can be no doubt, under the doctrine of parens patriae, that the State has the sovereign power of guardianship over persons under disability, and it alone has the right and power to determine the recipient of the privilege to adopt one of its wards. To insure the best interest of a child, the power of the State transcends the rights of natural parents; and if they are unfit to have the custody, their children may be taken from them.
210 Miss. at 651, 50 So.2d at 366. See also, Reynolds v. Davidow, 200 Miss. 480, 27 So.2d 691 (1946).
Given that the state has the power to terminate parental rights as to custody of an infant, what are the limitations, if any, upon the exercise of this power by the state? Recently the United States Supreme Court addressed the issue in Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), while evaluating the constitutionality of the New York statutes providing for termination of parental custody *810 rights as to an infant. New York Social Service Law §§ 384-b.4.(d), 384-b.7.(a), and the New York Family Court Act § 622 authorized termination of parental rights following a finding of appropriate grounds established by a "fair preponderance of the evidence". Our nation's high court stated that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment, and that constitutional due process in such termination proceedings is essential. Cited in Santosky is Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), as holding that the nature of process due in a parental rights termination case is to be determined by balancing the three factors first enumerated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):
[1] The private interests affected by the proceeding;
[2] The risk of error created by the state's chosen procedure;
[3] And the countervailing governmental interest supporting use of the challenged procedure.
Justice Blackmun in speaking for the U.S. Supreme Court, quoted from Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), stating that:
The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."
Santosky, ___ U.S. at ___, 102 S.Ct. at 1395, 71 L.Ed.2d at 607.
A standard of proof was viewed by the Court as reflecting society's judgment as to how the risk of error should be allocated between the litigants. At oral argument, suggestion was made on behalf of appellees that, even if the standard of proof established by the Mississippi statute is constitutionally defective, we need not reverse in this particular case because the proof of the natural father's lack of fitness is much stronger than "a preponderance" of evidence. In response, it should be noted that the United States Supreme Court stated in Santosky:
Since the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard.
___ U.S. at ___, 102 S.Ct. at 1396, 71 L.Ed.2d at 609.
Santosky went on to examine the consequences of such proceedings:
11. For a child, the consequences of termination of his natural parents' rights may well be far-reaching. In Colorado, for example, it has been noted: "The child loses the right of support and maintenance, for which he may thereafter be dependent upon society; the right to inherit; and all other rights inherent in the legal parent-child relationship, not just for [a limited] period ..., but forever." In re K.S., 33 Colo. App. 72, 76, 515 P.2d 130, 133 (1973).
Some losses cannot be measured. In this case, for example, Jed Santosky was removed from his natural parents' custody when he was only three days old; the judge's finding of permanent neglect effectively foreclosed the possibility that Jed would ever know his natural parents.
Id. ___ U.S. at ___, 102 S.Ct. at 1398, n. 11, 71 L.Ed.2d at 611, n. 11.
The court held that in a termination of parental rights proceeding, the process which is due under the Fourteenth Amendment of the United States Constitution as determined by an application of the balancing of the three Eldridge factors requires a standard of proof which is "at least clear and convincing" as opposed to one which is *811 merely by a "fair preponderance of the evidence".[2]
Under Santosky, supra, the standard of proof established by Mississippi Code Annotated § 93-15-109 (Supp. 1981), is obviously deficient and unconstitutional because it allows parental rights termination to be decreed based upon a preponderance of the evidence, rather than the standard of at least "clear and convincing" evidence. Of course the only portion of the statute which is affected by our decision today is the standard of proof required by § 93-15-109 (Supp. 1981) in a termination of parental rights action. The standard of proof in any such action brought under the statute must be "clear and convincing" in accordance with Santosky, supra. Other than in this one aspect, the operation and application of the statute is unaffected.
Our decision in Reyer v. Harrison County Department of Public Welfare, 404 So.2d 1023 (Miss. 1981), upon different facts, dealt with this issue as to the standard of evidence, but that case did not reach the constitutional issue here presented. In Doe v. Attorney W., 410 So.2d 1312 (Miss. 1982), we upheld a termination of parental rights based upon Mississippi Code Annotated § 93-15-1 (1972), which is no longer in effect. Our decision noted that the evidence was "clear and convincing", Id. at 1317. Section 93-15-1 (1972) did not set forth any standard of proof, but a mere "preponderance of the evidence" is required under present § 93-15-109 (Supp. 1981).
Under our oath of office, we are sworn to uphold the Constitution of the United States as interpreted by the United States Supreme Court, and accordingly we are obliged to reverse. In view of this decision, we do not reach other issues (mostly evidentiary rulings) raised in the briefs. Of course, the appropriate court, upon proper application, may provide for custody of the children according to facts established by relevant testimony as indicated by the present circumstances and needs of the children. At any retrial of this cause in accordance with Santosky, supra, the requisite standard of proof must be "clear and convincing," the standard which we required in Doe v. Attorney W., supra, rather than a mere preponderance of the evidence.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and ROY NOBLE LEE, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
BOWLING, J., takes no part.
NOTES
[1] Since this case has features not unlike adoption, under Mississippi Code Annotated §§ 93-17-25, 93-17-29, and 93-17-31 (1972) the actual names of the children and parties are not used.
[2] In a note the Supreme Court listed fourteen states which have, by statute, adopted the "clear and convincing evidence" or its equivalent standard. Additionally, sixteen states, the District of Columbia and the Virgin Islands, have adopted this standard by court decision. South Dakota requires a "clear preponderance of the evidence" and New Hampshire and Louisiana require evidence "beyond a reasonable doubt." ___ U.S. ___, 102 S.Ct. at 1392, 71 L.Ed.2d 604.