# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 95-CA-00229-SCT

*LARRY JOE HUMPHREY*

*v.*

*J.R. PANNELL AND WINIFRED P. PANNELL*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/03/95 |
| TRIAL JUDGE: | HON. JOHN C. ROSS JR. |
| COURT FROM WHICH APPEALED: | PRENTISS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAN J. DAVIS |
| ATTORNEY FOR APPELLEES: | JOHN A. FERRELL |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 4/16/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/7/98 |

**EN BANC.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

### I. INTRODUCTION

¶1. The present case centers around the legal rights of Larry Joe Humphrey, the natural unwed father[1] of a child born to a woman in an existing marriage. Specifically, this Court is called upon to determine what legal rights to notice, if any, Humphrey may have had with regard to an adoption of the child by the child's grandparents. This Court holds that Humphrey was entitled to no notice under the statutory or common law of this State and that Humphrey's constitutional rights were similarly not violated in the present case. This Court accordingly holds the adoption of the minor child to be valid in spite of the lack of notice granted to Humphrey.

¶2. This Court also finds that, given the validity of the adoption, the trial court was correct in refusing to divest the adoptive parents of custody of the minor child. The facts of the case, which include allegations of sexual abuse by a neighbor, do not warrant a termination of the parental rights of the adoptive parents.

### II. STATEMENT OF THE FACTS AND CASE

¶3. Tryxie Lynn Pannell ("Tryxie") was born on January 23, 1987 to Rossion S. Gibson ("Rossion"), who, at the time of the girl's conception and birth, was married to William T. Gibson ("Gibson").

Gibson, however, is not the girl's biological father. The parties all agree that Tryxie's natural father is Larry Joe Humphrey, Appellant herein, who had an adulterous affair with Rossion. On August 27, 1987, a Petition for Adoption was filed by J.R. Pannell and his wife, Winifred P. Pannell, the maternal grandparents of Tryxie, and consented to by Rossion, the natural mother, and Gibson, the presumptive father. No notice of the adoption was granted to Humphrey, and a final decree of adoption was entered that same day.

¶4. In the seven months between Tryxie's birth and adoption, Humphrey showed little inclination to support Tryxie, although he was aware of his paternity. Humphrey became aware of the adoption within a few months of its occurrence, but he did not contest this adoption for almost five years, when, in 1992, he challenged the adoption on jurisdictional grounds and sought custody of the child.

¶5. As a result of the petition filed by Humphrey, the Chancellor on June 8, 1992 entered an Agreed Decree which represented a voluntary agreement between the parties. The Decree recited that all relevant facts had been not known to the court in the adoption hearing, given that Larry Joe Humphrey had not been identified as the natural father of Tryxie. The Decree acknowledged, and all parties agree, that Humphrey was the biological father of Tryxie. The Decree further modified the Final Decree of Adoption "to the extent that Larry Joe Humphrey is recognized as the natural father of the minor child, and (his ) parental rights are not terminated." The Decree further granted Humphrey visitation rights with Tryxie, and, in return, Humphrey recognized the adoption of Tryxie by the Pannells and agreed to pay child support for Tryxie. No appeal was taken from this decree or from the original decree of adoption to the Pannells.

¶6. On August 14, 1992, the Chancellor and the parties entered an Agreed Order Concerning Visitation, which granted Humphrey greater visitation rights with Tryxie. These visitation rights were increased once again on September 18, 1992, pursuant to another Agreed Decree. No appeal was ever taken from any of these original or amended orders.

¶7. On July 20, 1993, the Pannells filed a complaint for modification requesting that the Chancellor "significantly restrict" Humphrey's visitation privileges with Tryxie, noting his criminal history, past drinking problems, and a recent arrest for assault on a police officer. Humphrey filed a counter-claim for modification of the former decree, requesting that Tryxie be placed under his custody on the grounds that he would provide a better home for the child. Humphrey notes the advanced ages of the Pannells[2] and cites their poor health and living conditions as grounds for the modification. He further notes that the grandparents occasionally leave Tryxie with her biological mother, whose living conditions and habits, he alleges, are a detriment to the child. On November 23, 1993, the Chancellor issued an order directing the Department of Human Services to perform home studies on the Pannell and Humphrey homes and further modifying the visitation schedule.

¶8. On April 19, 1994, a hearing was held regarding the parties' various complaints for modification, and the Chancellor found that the proof did not support a finding of a material change in circumstances. The Chancellor therefore concluded that the Pannells' motion for modification should be denied. With regard to Humphrey's counter-complaint, the Chancellor did allow Humphrey liberal visitation rights, and the Pannells were enjoined from allowing Tryxie to be in the unsupervised presence of Tryxie's natural mother and Mr. Gibson.

¶9. On a Saturday night in December, 1994, the Pannells allowed Tryxie to be under the care of her

biological aunt and uncle, Selmer and Gary South. While Selmer was asleep, Gary, who was allegedly drunk and had been watching a pornographic movie, allegedly fondled Tryxie's genital area. Tryxie reported the incident to three of her schoolteachers and her principal, but none of these parties notified authorities about the complaint.

¶10. On December 16, 1994, Tryxie informed Humphrey's wife Glenda about the alleged incident, and Glenda notified the Prentiss County Department of Human Services that same day. A meeting was held between Tryxie, the Pannells, the Humphreys, and social services and law enforcement personnel, at which meeting the Pannells stated that they did not believe Tryxie's accusations against Gary South. Tryxie expressed her strong desire to live with the Humphreys, and the Pannells tried to persuade her to stay with them.

¶11. At the end of the meeting, Tryxie frantically resisted efforts to force her to return to the Pannells' home, according to Martha Hickman ("Hickman"), the social worker handling the case, who witnessed the incident. Following Tryxie's further resistance in the car, the Pannells eventually returned her to the Sheriff's office, whereupon she was placed under foster care by agreement. At a hearing, the Chancellor returned Tryxie to the Pannells' custody, but he ordered that she not be allowed to have contact with Gary South.

¶12. On December 22, 1994, Humphrey filed a complaint to set aside the adoption of Tryxie. He also sought contempt of court sanctions against the Pannells based on the Pannells' allegedly permitting Tryxie to be in the unsupervised presence of Tryxie's natural mother. In addition, Humphrey once again sought modification of custody, based on the alleged incident of sexual abuse, and he requested a temporary order removing Tryxie from foster care and placing her in his custody.

¶13. The Chancellor issued a temporary order on January 24, 1995, in which he ordered Tryxie returned to the custody of the Pannells. On February 8, 1995, the Chancellor issued a decree denying Humphrey's motion to set aside the Final Decree of Adoption, dismissing the contempt complaint against the Pannells, denying a modification in custody, and ordering Humphrey to pay an arrearage in child support. On March 6, 1995, Humphrey timely perfected a notice of appeal from the Decree of February 8, 1995 to this Court. On March 10, 1995, the Chancellor issued a decree prohibiting the Pannells from allowing Tryxie to have "any contact with or be in the presence of Gary South until further orders of this Court."

### III. LEGAL ANALYSIS

#### WHETHER THE CHANCELLOR ERRED IN FAILING TO SET ASIDE THE ADOPTION FOR LACK OF JURISDICTION?

**A. Did Humphrey, as an unwed putative father, have any right to notice of the adoption under the statutory and/or common law of this State ?**

¶14. In determining whether Humphrey had a legal right to notice of the adoption, this Court first notes that, as an unwed father, Humphrey had no statutory rights whatsoever with regard to Tryxie's adoption. Miss. Code Ann. § 93-17-5 (1994), which requires that "parents" be made parties to the adoption proceedings, does not consider the father of an illegitimate child to be a "parent" for the

purposes of the statute at all. The statute provides in part that:

> [In] the case of a child born out of wedlock, the father shall not be deemed to be a parent for the purpose of this chapter, and no reference shall be made to the illegitimacy of such child.

Thus, § 93-17-5 expressly provides that the father of an illegitimate child is not a "parent" at all for the purposes of the adoption statutes. Both "parents" are entitled to notice of the adoption under Mississippi statutory law, but the father of an illegitimate child is denied the basic status of parent under the adoption statutes of this State. The constitutional implications of such provision are discussed *infra*, but, by clear dictate of statute, Humphrey was entitled to no notice under the adoption statutes of this State.

¶15. Humphrey cites two decisions of this Court, which, he contends, demonstrate that he had a right to notice of the pending adoption. Humphrey cites the cases of ***Krohn v. Migues***, 274 So.2d 654, 657 (Miss. 1973) and ***Birindelli v. Egelston***, 404 So.2d 322, 324 (Miss. 1981) for the proposition that "without inclusion of the natural father as a party, the Final Decree of Adoption is Void." Contrary to Humphrey's arguments, neither of these cases provides support for his assertion that the adoption of Tryxie is void under the law of this State.

¶16. In ***Krohn***, this Court found that the father had been married to the mother at the time the baby was born and that he was thus entitled to notice. ***Id.*** Thus, ***Krohn*** is clearly distinguishable from the present case, in which Humphrey was not married to the mother at the time Tryxie was born.

¶17. In ***Birindelli***, this Court held that:

> We also are of the opinion that even if process had been returnable to the proper district, the adoption decree would still be void for lack of jurisdiction because Birindelli testified without contradiction that he did not receive notice of the adoption proceedings.

***Birindelli***, 404 So.2d at 324.

¶18. Although the facts in ***Birindelli*** are not entirely clear, it appears, that Birindelli, like the father in ***Krohn,*** was a married father. The opinion contains the following language:

> ... Birindelli's testimony he did not receive *statutory* notice of the adoption proceeding renders the adoption decree void.

***Birindelli***, 404 So.2d at 324. (emphasis added.) Given the language referring to "statutory" notice, it appears that Birindelli was not an unwed father, given that such unwed fathers clearly have no right to notice under the statutory adoption scheme of this state.

¶19. Thus, ***Birindelli*** is not on point, and § 93-17-5 makes it clear that Humphrey had no statutory right to notice in the present case. Although there is thus no basis for challenging the adoption under the common law or statutory law of this State, this Court nevertheless turns to the Constitutional issues in the present case in order to completely address the issues herein.

> **B. Did the lack of notice of the adoption granted to Humphrey deprive him of a constitutional right as set forth by the United States Supreme Court ?**

¶20. Although Miss. Code Ann. § 93-17-5 and applicable decisions of this Court do not require notification of the natural unwed father of an illegitimate child, applicable United States Supreme Court decisions nevertheless make it clear that this Mississippi statute would be unconstitutional in its application in certain cases, particularly in cases in which the natural unwed father has attempted to establish a substantial relationship with the child. Commentators have recognized the constitutionally suspect nature of §93-17-5 for years, but the Legislature has not addressed this issue to date.[(3)]

¶21. The United States Supreme Court has clearly indicated that a natural unwed father of an illegitimate child may, in certain circumstances, have a constitutional right to be notified of or to withhold his consent to, an adoption. Given that no such rights are provided for by § 93-17-5, this statute is clearly unconstitutional to the extent that the United States Supreme Court has held such a right to exist.

¶22. The primary United States Supreme Court cases dealing with the constitutional rights of putative fathers are *Stanley v. Illinois*, 405 U.S. 645 (1972), *Quilloin v. Walcott*, 434 U.S. 246 (1978), *Caban v. Mohammed*, 441 U.S. 380 (1979), and *Lehr v. Robertson*, 463 U.S. 248 (1983). In *Stanley*, the U.S. Supreme Court held unconstitutional an Illinois statute which conclusively presumed every father of a child born out of wedlock to be an unfit person to have custody of his children. *Stanley*, 405 U.S. at 658. *Stanley* set the stage for later rulings of the U.S. Supreme Court reaffirming the Constitutional rights of unwed fathers, but the holding is otherwise of little relevance to the present case.

¶23. In *Quilloin*, the U.S. Supreme Court considered the constitutionality of a Georgia statutory scheme which required that an natural unwed father legitimate the child in order to be able to exercise a veto power over the child's adoption. *Quilloin*, 434 U.S. at 248-49. The Supreme Court held that, under the facts of that case, the Georgia statute did not deprive the father of any constitutional rights. The Supreme Court indicated that a primary consideration in such cases is the extent to which the father has cared for the child and treated her as his own. *Quilloin*, 434 U.S. at 256. For the purposes of the present case, however, *Quilloin* is of only limited assistance, given that it did not involve a father who had been denied notification of an adoption.

¶24. In *Caban*, the U.S. Supreme Court considered a New York statute which gave an unwed mother the authority to block an adoption simply by withholding her consent, but which only gave an unwed father the right to block the adoption by showing that the best interests of the child would "not permit the child's adoption." *Caban*, 441 U.S. at 386-87. The U.S. Supreme Court, applying the "intermediate scrutiny" test for gender-based discrimination in an equal protection analysis, held that, while New York's interest in promoting the well-being of illegitimate children is an important one, the State had not established that the "different treatment afforded unmarried fathers and unmarried mothers under [the New York statute] bears a substantial relationship to the proclaimed interest of the State in promoting the adoption of illegitimate children." *Id.* at 393. Thus, the U.S. Supreme Court held the statute in question to be unconstitutional as applied in that case.

¶25. The U.S. Supreme Court noted in *Caban* that:

> In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child. Indeed, under the statute as it now stands the

surrogate may proceed in the absence of consent when the parent whose consent otherwise would be required never has come forward or has abandoned the child. . . . . But in cases such as this, where the father has established a substantial relationship with the child and has admitted his paternity, a State should have no difficulty in identifying the father even of children born out of wedlock.

*Id.* at 392-93. Thus, the U.S. Supreme Court limited the holding in *Caban* to those cases in which the putative father had established a "substantial relationship" with the child, and, equally importantly for the present case, stated that consideration should be given to the ability of the State to identify the father of the child in order that adoptions may proceed without undue delay. *Id.*

¶26. Neither of these factors are present in the present case, given that Humphrey did not develop a "substantial relationship" with Tryxie in the months between her birth and adoption, nor in the five years following her adoption. Moreover, the State of Mississippi, in the form of the Chancery Court, had no possible way of knowing that Humphrey was the natural father of Tryxie, given that the child was presented to the Court as the natural child of Mr. and Mrs. Gibson, both of whom were notified of and consented to the adoption.

¶27. In *Lehr v. Robertson*, 463 U.S. 248 (1983), the Supreme Court upheld an adoption of which a putative father had not been notified. The Court based its holding, however, largely upon the fact that New York State maintained a registry by which a putative father could guarantee that he was notified of any adoption proceedings by mailing a postcard to a registry. *Lehr*, 463 U.S. at 264. Also, the New York statute provided for notification of certain classifications of unwed fathers, such as those who lived openly with the child. *Id.* at 251. Mississippi has no comparable notification provision or registry, thus leaving Mississippi's lack of notification pursuant to §93-17-5 constitutionally suspect.[4] As in *Caban*, the U.S. Supreme Court in *Lehr* placed heavy emphasis on the degree to which the putative father had attempted to establish a relationship with his child in determining the extent of his constitutional parental rights. Both *Caban* and *Lehr* thus provide indications that Humphrey's constitutional rights were not violated under the facts of the present case.

¶28. A more recent U.S. Supreme Court decision involving a putative father similarly situated to Humphrey provides further indication that Humphrey's rights were not violated by the lack of notification of the adoption proceedings in the present case. In *Michael H. v. Gerald D.*, 491 U.S. 110 (1989), the U.S. Supreme Court considered the constitutionality of a California statute which provided that the child of a married woman cohabiting with her husband is presumed to be a child of the marriage, as long as the husband is not impotent or sterile. Michael H., a natural unwed father of a child born to a married couple, filed an action to establish his paternity and visitation rights. The trial court dismissed his action based on the aforementioned California statute, and this ruling was affirmed by the California Court of Appeals. *Id.* at 116.

¶29. On appeal to the United States Supreme Court, five justices affirmed, holding that the California statute did not deprive Michael of any protected liberty interest, with Justice Stevens concurring based only upon certain statutory protections found in the California statute. The plurality opinion of Justices Scalia, Rehnquist, Kennedy, and O'Connor, noted that:

In *Lehr v. Robertson*, a case involving a natural father's attempt to block his child's adoption by the unwed mother's new husband, we observed that "[t]he significance of the biological

connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring," and we assumed that the Constitution might require some protection of that opportunity. Where, however, the child is born into an extant marital family, the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the state to give categorical preference to the latter.

*Id.* at 128-29 (citations omitted). The opinion further noted that the Court could find no basis for concluding that a father in Michael's (and, presumably, Humphrey's) position could legitimately assert constitutional rights, such as those discussed in *Lehr* and *Caban*. The justices noted that:

We have found nothing in the older sources, nor in the older cases, addressing specifically the power of the natural father to assert parental rights over a child born into a woman's existing marriage with another man. Since it is Michael's burden to establish that such a power (at least where the natural father has established a relationship with the child) is so deeply imbedded within our traditions as to be a fundamental right, the lack of evidence alone might defeat his case. But the evidence shows that even in modern times- when, as we have noted, the rigid protection of the marital family has in other respects been relaxed- the ability of a person in Michael's position to claim paternity has not been generally acknowledged.

*Id.* at 125. While only a plurality opinion, the holding in *Michael H.* indicates that a putative father who fathers a child born into a woman's existing marriage with another man has no right to assert parental rights, and thus, presumably, to claim a right to notice of or to object to the adoption.

¶30. None of the aforementioned United Supreme Court cases are directly on point, but considered in the aggregate, these opinions leave little doubt that Tryxie's adoption did not violate Humphrey's constitutional rights under the facts of the present case. Given that there is similarly no basis for the adoption to be set aside under the statutory or common law of this State, the adoption of Tryxie by the Pannells was valid. Accordingly, the ruling of the chancellor in upholding the adoption of Tryxie by the Pannells is affirmed.

### IV. WHETHER THE COURT ERRED IN FINDING THAT THE PANNELLS WERE NOT IN CONTEMPT OF COURT?

¶31. The Chancellor ruled that the Pannells were not in contempt of the January 6, 1994 emergency decree ordering the Pannells to keep Tryxie away from Gary South and requiring them to prevent her from having any contact with him. The contacts which Tryxie had with South were very unsubstantial, and it can not be said that the Chancellor was manifestly in error in refusing to find the Pannells in contempt. Accordingly, this point of error is without merit.

### V. WHETHER THE CHANCELLOR ERRED IN PLACING A CHILD BACK INTO A HOME TO WHICH SHE WAS VIOLENTLY OPPOSED TO STAYING AND IN WHICH SHE WAS CONTINUALLY EXPOSED TO A MAN WHO HAD SEXUALLY ABUSED HER?

¶32. In order to determine the correct standard under which to consider the custody issues before this Court, it is necessary for this Court to first establish exactly who Tryxie's parents are in the eyes of

the law. Miss. Code Ann. § 93-17-13 (1994) specifically provides that all parental rights of the natural parents are cut off by an adoption, except in the case of a natural parent who is the spouse of an adopting parent. However, the statute provides that such is the case "unless otherwise specifically provided", which language gives rise to questions concerning the significance of this qualification. In the present case, the Agreed Decree provided that:

> (P)etitioner (Humphrey) acknowledges the adoption, but Respondents acknowledge that Petitioner is the natural father of the said minor child. Accordingly, the Final Decree of Adoption should be modified to the extent that Larry Joe Humphrey is recognized as the natural father of the minor child, *and that Petitioners parental rights are not terminated.* (emphasis added).

Thus, the Agreed Decree is superficially consistent with the language of § 93-17-13 in recognizing the adoption of Tryxie by the Pannells but nevertheless reserving parental rights in favor of Humphrey.

¶33. It is clear, however, that a parent who is giving up a child for adoption or, as in this case, acknowledging the validity of an adoption, can not retain *all* of his parental rights or else the adoption is rendered meaningless. By allowing Humphrey to argue that he should be granted custody based on this State's modification of parental custody law, the Chancellor in effect placed Humphrey on near-equal footing with the Pannells as far as their right to custody of Tryxie is concerned. In *Natural Father v. United Methodist Children's Home*, 418 So.2d 807 (Miss. 1982) this Court declared unconstitutional the portion of Miss. Code Ann. § 93-15-109 which allowed for the termination of parental rights upon a "preponderance of the evidence" standard. This declaration was made in light of the United States Supreme Court's decision in *Santosky v. Kramer*, 455 U.S. 745 (1982), in which said Court held that due process required that the parent's unfitness be proven by "clear and convincing evidence" before his or her parental rights were terminated.

¶34. If Humphrey had prevailed in demonstrating a "material change in circumstances" based on the preponderance of evidence standard, then he would presumably have been able to divest the Pannells of custody of their legal child. Such a result comes dangerously close to terminating the Pannells' parental rights on the basis of a preponderance of the evidence standard which was rejected by this Court, the Legislature, and the U.S. Supreme Court. This proceedings in the present case were admittedly not termination of parental rights proceedings, but the effect to an adoptive family of divesting them of custody of their child is sufficiently similar to raise valid constitutional concerns.

¶35. Of equal importance to the constitutional issues are the public-policy considerations which permeate the adoption statutes as set forth by the Legislature. Miss. Code Ann. § 93-17-15 (1994) provides that:

> No action shall be brought to set aside any final decree of adoption, whether granted upon consent or personal process or on process by publication, except within six (6) months of the entry thereof.

Miss. Code Ann. § 93-17-21 (1) (1994) provides that:

> The [Bureau of Vital Statistics] shall prepare a revised birth certificate which shall contain the

original date of birth, with the place of birth being shown as the residence of the adoptive parents at the time the child was born, but with the names of the adopting parents and the new name of the child.

These adoption statutes, including the six-month statute of limitation for challenging adoptions[(5)], provide a good illustration of the intent of the Legislature that the adoption process give rise to a new relationship between the adoptive parents and child which is not subject to endless legal contests[(6)]. The parent-child relationship, by its very nature, requires stability and permanence, and the Legislature has clearly recognized this fact in the adoption and termination of parental rights statutes of this State.

¶36. In the view of this Court, the public policy considerations favoring the permanence of adoptions are inconsistent with an interpretation of § 93-17-13 which would permit the sort of post-adoption modification of custody battles which have arisen in the present case. The "unless otherwise specifically provided" in § 93-17-13 language must be interpreted in light of the context of the adoption statutes as a whole, and these statutes are clearly written to foster legal stability in the relationship between adoptive parents and their children. In the view of this Court, the "unless otherwise provided" language was intended by the Legislature to provide natural and adoptive parents with the option of entering into limited arrangements such as post-adoption visitation agreements as long as the best interests of the child would be served by such an arrangement.

¶37. Post-adoption visitation arrangements are permitted in a number of states, and the "unless otherwise specifically provided" language in § 93-17-13 would appear to permit such arrangements. The annotation found at 78 **ALR 4th** 218, "Post-adoption Visitation by Natural Parent" discusses a number of state court decisions which allow parties to agree to post-adoption visitation in cases in which it is deemed to be in the child's best interests. However, the **ALR** annotations reveal no state which allows the sort of "quasi-adoption" which has been implemented in the present case, nor do the parties cite any such cases. A large number of states, in fact, do not even permit post-adoption visitations on grounds that this visitation is detrimental to the relationship between the adoptive parent and child. This Court considers it improper to incidentally rule upon the propriety of post-adoption visitations in the present case, however, and we leave a ruling on this important issue to future cases when the issue is squarely before this Court.

¶38. This Court does conclude, however, that § 93-17-13 was not intended by the Legislature to grant a natural parent the right to weaken the legal bonds of the adoptive parent-child relationship by reserving the right to, in effect, sit and wait for the circumstances of the adoptive family to materially change and then divest the adoptive family of the custody of the child. The United States Supreme Court, as noted earlier, has placed a high constitutional value on parental rights which arise from caring and nurturing a child, and this value should also apply to adoptive parents who have developed a relationship with a child. It is undeniable that families may enter difficult situations relating to finances, health, or personal differences and these situations may constitute "material changes in circumstances." Such difficulties are a fact of life, however, and they are not grounds for dissolving the familial relationship created by the adoption process and granting custody of the children to a natural parent.

¶39. This Court need not theorize about any potential or abstract dangers of allowing post-adoption

custody battles, given that the present case serves as an all-too real example of the dangers of allowing the sort of "quasi-adoption" which has been implemented in the present case. The record in the present case reveals a sad history of painful litigation which has arisen following the Agreed Degree, and a great deal of the pain has been borne by Tryxie.

¶40. This Court accordingly holds that the portion of the Agreed Decree which recognizes the validity of the adoption yet which reserves parental rights in favor of Humphrey should not be interpreted to permit Humphrey to attempt to divest the Pannells of the custody of their adoptive child based upon a material change in circumstances. This Court nevertheless finds the remaining provisions of the Agreed Decree regarding visitation and support to be a voluntary agreement between the parties that is in the best interests of Tryxie. This Court upholds the Chancellor's ruling to continue to enforce the visitation and child support provisions of the Agreed Decree as long as the enforcement thereof is consistent with the best interests of Tryxie and as long as Humphrey complies with the support feature of the contact.

¶41. Although he neglected to establish a relationship with her in her early years, Humphrey clearly cares for Tryxie, as is evidenced by the legal expenses he has incurred in her behalf in spite of limited means. While the Pannells are Tryxie's legal parents in the eyes of the law, the fact remains that there is a possibility that they will not live long enough to raise Tryxie to adulthood.[7] In the event of the death of the Pannells, it would serve Tryxie's best interests for her to have been able to develop a relationship with Humphrey, who has recently shown a willingness to assume partial responsibility for her support.[8]

¶42. With regard to the incident which led to the present custody battle, this Court is faced with allegations of conduct which are of an extremely serious nature. At the same time, however, the allegations are not made against Tryxie's parents, but rather against South, who lives near the Pannells. The alleged incident of sexual abuse, if true, appears to be an isolated incident which has been investigated and addressed by the Chancellor and various social and law enforcement agencies. This Court does not consider it necessary to remand for additional proceedings with regard to Tryxie's legal status as the daughter of the Pannells, but we trust that the Chancellor will pay careful attention to Tryxie's progress and hold hearings with regard to her welfare if they should become necessary.

## IV. CONCLUSION

¶43. This Court agrees with the Chancellor's rulings that the adoption of Tryxie by the Pannells be upheld and that the Pannells retain custody of Tryxie as befits their legal status as her adoptive parents. This Court concludes that the Chancellor should continue to permit the provisions of the voluntary agreement pursuant to which Humphrey is granted visitation with Tryxie in return for substantial compliance with the child support provisions of this decree. This Court accordingly affirms the Chancellor's denial of a change in custody, although we reach that affirmance by application of a different legal standard than that applied at the trial court.

¶44. **JUDGMENT IS AFFIRMED.**

**SMITH AND MILLS, JJ., CONCUR. BANKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J. McRAE, J.,**

**DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, P.J., AND ROBERTS, J. WALLER, J., NOT PARTICIPATING.**

### BANKS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶45. I agree with the result reached by the majority. I write because I cannot agree with what the majority says about our adoption statute and the settlement decree reached by the parties to this matter and entered by the court in previous litigation. The parties have not disagreed as to the scope of the statute or the decree. The latter is res judicata and not properly the subject of our "interpretation." Beyond that, in my view, the majority raises a "boogey man" that is simply not there in this intra-family adoption and, in fear of the "boogey man", finds public policy reasons to avoid the plain wording of our statute.

### I.

¶46. In this case the Pannells, the child's natural grandparents, adopted the child without notice to Humphrey his natural father. Litigation later ensued contesting the adoption. That litigation was settled by the parties with a decree which specified, among other things, that Humphrey's parental rights were not terminated by the adoption. Still later after the occurrence of certain events with Humphrey and with the child, the Pannells sought a change in visitation and Humphrey sought a change in custody. While the Pannells resisted Humphrey's request, they did not do so on the grounds that the parental rights he retained somehow gave him less standing to contest custody than any other non-custodial parent. The decree to which they agreed suggests no such limitation.

¶47. It is also clear that the decree allowing Humphrey to retain parental rights is not in contravention of our statute. That statute provides that "unless otherwise specifically provided" a final decree of adoption shall have the effect of all parental rights of a natural parent. Miss. Code Ann. § 93-17-13 (1994). Here the decree "specifically provided" that Humphrey's parental rights were not terminated. To me, that means no more or less than what it says.

¶48. It follows that I see no reason why this court should discuss the parameters of Humphrey's parental rights. It is not a contested issue in this case. It has not been put to the chancery court which entered the decree which retained his rights. I would not reach the issue. Moreover, I disagree with what the majority pronounces with respect to the question.

### II.

¶49. In response to what it deems public policy concerns, the majority suggests that the statute and the decree simply cannot mean what they plainly say because that would somehow negate an adoption. That is simply not so. An adoption bestows parental rights and obligations upon the adoptive parent or parents. That fact is not diminished by a natural parent or parents retaining equal rights any more than a natural mother's rights are diminished by the fact that a natural father also may have rights whether or not the two were ever married. The plain fact is that whenever those with

parental rights are separated from a child, choices have to be made concerning custody, visitation and support. As always, the paramount concern will be the best interest of the child. Granting custody to one parent is not tantamount to termination of parental rights as the majority suggests. An array of both rights and obligations remain. These include, to name a few, the right to inherit, the right of reasonable visitation (restricted only by what is in the best interest of the child), the residual right to custody should there be a death of the custodial parent or a material change in circumstances and the duty of support. These are rights which grandparents, for example, would not ordinarily have in the absence of adoption.

¶50. It is true that allowing a natural parent to retain equal parental rights with adoptive parents in what might be termed the traditional sense of adoption, wherein strangers adopt a new or recently born child to raise as their own, might create intolerable complications. It is equally true, however, that not all adoptions are "traditional." The chancellor is in the best position to assess this question with respect to each adoption on a case by case basis. If the chancellor does nothing, the effect of the decree is to terminate parental rights. If the chancellor speaks to the issue, parental rights are terminated only to the extent that the decree does not provide otherwise. That is, the chancellor, on a case by case basis, may retain in the natural parents all or some of the parental rights and duties. The chancellor is guided in such determinations by the paramount principle of doing what is in the best interest of the child, as well as the rights of the other parties.

¶51. In my view, the retention of parental rights in natural parents post-adoption will not and should not be the norm. It should be rare to non-existent where there is other than an intra family adoption. Where the parties knowingly and intelligently agree and the chancellor does not believe that such an arrangement offends the best interests of the child is one circumstance. Where the parties disagree but the chancellor, based upon consideration of all of the surrounding circumstances, concludes that it is in the best interest of the child that all or some of the parental rights and duties of natural parents not be terminated is another. The chancellor's decision in this regard as any chancellor's decision is subject to review for manifest error. Moreover, parental rights not terminated by adoption may, nevertheless, be later terminated for the reasons stated and in the manner provided in our statutory scheme. Miss. Code Ann. §§ 93-15-103 et seq (1994).

¶52. Finally, in the unusual circumstances where parental rights are retained, I see no reason to erect across-the-board barriers to requests for a change in custody. Our chancery courts are well equipped with powers to curtail any frivolous petitions for changes in custody. Why should we erect an insurmountable legal barrier without regarding the facts of a particular case? The instant case is one in which there is clearly a colorable claim for a change in custody. Why should the child have to wait for the welfare department to bring that claim where there is a natural parent whose parental rights have for some reason (either a decision of the court, agreement of the parties or both) not been terminated, who can assert the claim? Our problems usually arise when there are too few parents willing to take interest in the welfare of children, not too many.

¶53. I, like the majority, would affirm the chancellor in denying Humphrey's petition to set aside the adoption and his decision retaining custody in the Pannells on the record before us. The court should go no further, however.

**SULLIVAN, P.J., JOINS THIS OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶54. I disagree with the majority's finding that Larry Joe Humphrey, the recognized biological father of Tryxie Lynn Pannell, was not entitled to notice of the child's adoption proceedings. Moreover, as a matter of law, a decree of adoption terminates the parental rights of the child's biological parents. We cannot both let the adoption stand, and at the same time recognize the natural father's parental rights. For these reasons, I would find the original decree of adoption to be null and void. Accordingly, I dissent.

¶55. This case is a classic example of the old adage that bad facts don't make good law. A minor child was adopted by her elderly maternal grandparents, the Pannells. Notice was given only to the child's mother, Rossion Gibson, and her husband, William Gibson. The biological father, Larry Joe Humphrey, was not noticed of the action despite the fact that all parties knew that he, and not the mother's husband, was the child's father. Subsequently, nearly five years later and after charges of sexual abuse were raised against the child's maternal aunt and uncle, Humphrey's parental rights were recognized and by the terms of the agreed order, Humphrey was given even more liberal visitation privileges and ordered to pay child support.

¶56. The majority finds that Humphrey was not entitled to notice of the adoption proceedings and upholds the Pannells' adoption and custody of the minor child. Had the fact of paternity been unknown to the child's mother or to the Pannells at the time of the adoption proceedings, there would be some merit to the majority's position. However, as the Decree acknowledged, not all of the relevant facts had been made known to the court five years earlier, when the adoption took place. To the contrary, the Gibsons had represented themselves to the court as the child's biological parents. In essence, failing to make the court aware that Humphrey actually was the child's biological father amounts to a fraud on the court, intended only to effect the adoption and even terminate his parental rights without his knowledge or a determination of fitness. I would find that the fraud perpetuated upon the chancery court would serve to void the original decree and abridge any subsequent action. The termination of parental rights should not be accomplished without any notice to the parent and/or a hearing as to his fitness as a parent. In this case, the chancellor, having recognized Humphrey's parental rights and allowed him frequent visitation with his child, clearly found him to be a fit parent. However, as a matter of law, adoption terminates the parental rights of a biological parent and a natural or biological parent normally cannot be given back parental rights *after* a final decree of adoption has been entered. Miss. Code Ann. § 93-17-13 (1994) provides, in relevant part, as follows:

> The final decree shall adjudicate, in addition to such other provisions as may be found by the court to be proper for the protection of the interests of the child; and its effect, unless otherwise specifically provided, shall be that. . . (d) that the natural parents and natural kindred of the child shall not inherit by or through the child except as to a natural parent who is the spouse of the adopting parent, *and all parental rights of the natural parent, or parents, shall be terminated,* except as to a natural parent who is the spouse of the adopting parent.

Miss. Code Ann. § 93-17-13 (1994)(emphasis added). In *Millien v. State,* 408 So. 2d 71 (Miss. 1981), where this Court found that a decree terminating a father's parental rights was null and void,

we held that, "[w]hen a decree terminating parental rights is entered, it either terminates the parental rights or it does not. This decree does neither. It terminates parental rights and then grants visitation to the parent which contradicts termination of parental rights. We therefore conclude that the decree has no force and effect whatever and hereby set it aside." *Id.* at 74. Similarly, in the case *sub judice*, the majority has upheld the validity of both the original adoption decree, which as a matter of law, terminated Humphrey's parental rights, and also the order amending the decree to recognize his parental rights and afford him liberal visitation privileges. The two orders are inherently contradictory and cannot both stand.

¶57. The paramount concern should be the best interests of the child. In the case *sub judice*, upholding the adoption decree has had the unfortunate effect of rewarding those who appear to have misled the court below. I would, instead, find the original decree to be null and void. Accordingly, I dissent.

**PITTMAN, P.J., AND ROBERTS, J., JOIN THIS OPINION.**

1. Fathers of illegitimate children are often referred to as "putative fathers", which term is defined in Black's Law Dictionary as "(t)he alleged or reputed father of an illegitimate child." Given that the child in the present case is presumed to be legitimate, this term would not appear to apply to Humphrey in the present case.

2. J. R. Pannell is 72 years of age and his wife is 65 years.

3. N. Shelton Hand has written that:

> The Mississippi statute on parental consent for adoption continues to declassify the (unwed) father as a parent for purposes of the adoption statutes and the law specifies that no reference shall be made to the illegitimacy of the child. Clearly, it appears that the statute is in error and in contradiction to constitutional interpretations where the United States Supreme Court ruled that an unwed father could not constitutionally be presumed to be unfit to raise his own illegitimate children. ... The provisions of Mississippi's adoption consent statute should be amended, it appears, to comply with the rulings of the United States Supreme Court that require that the putative father be given notice of the adoption procedure. N. Shelton Hand, ***Mississippi Divorce, Alimony, and Child Custody***, § 21-5 (3rd. Ed. 1992).

4. The annotations to §93-17-5 misleadingly cite ***Lehr*** for the proposition that "[u]nmarried natural father's rights under due process and equal protection clauses are not violated by failure to give notice and opportunity to be heard before his child is adopted, where father has had no significant custodial, personal, or financial relationship with child."

In fact, ***Lehr*** was decided in a very different statutory context than §93-17-5, and the United States Supreme Court put great emphasis on the fact that New York maintained a putative father registry, of which this State has no counterpart.

5. The Agreed Decree was arguably a violation of the six-month statute of limitation for challenging the adoption, but this Court considers this decree to constitute a voluntary agreement among the parties which is in the best interests of the child.

6. This Court also does not address the issue of whether the 6-month statute of limitations in § 93-17-15 applies to constitutional due process challenges based on lack of notice, and, if so, to what extent.

7. At a hearing at the trial court level, Mrs. Pannell testified that her husband was 76 years old and that she was 67 years old.

8. This Court does not address whether the continued exercise of visitation and support in the future would demonstrate a commitment to responsibilities as if Humphrey were a parent so as to establish constitutional protections.