787 So.2d 1268 (2001)
In the Matter of the ADOPTION OF P.B.H.
L.T. and D.T.
v.
J.H.
No. 2000-CA-00042-SCT.
Supreme Court of Mississippi.
June 21, 2001.
*1270 Minor F. Buchanan, Jackson, Attorney for Appellants.
Lisa B. Milner, Jackson, Attorney for Appellee.
Before PITTMAN, C.J., MILLS and COBB, JJ.
MILLS, Justice, for the Court:
¶ 1. This contested adoption case arises from the Chancery Court of the First Judicial District of Hinds County. The chancellor refused to allow the biological father to withdraw his original consent to adopt and granted the adoption requests of opposing parties, the child's maternal grandmother and the former boyfriend of the child's deceased mother. The grandmother and her husband appeal the chancellor's decision. The biological father joins the appeal. Finding no reversible error, we affirm.

FACTS
¶ 2. Chancellor Singletary entered an order of adoption finding J.H. ("Jeff")[1] and L.T. ("Lori") to be the adoptive parents of P.B.H. ("the child"). Jeff is a former boyfriend of the deceased mother. He is not the father of the child. Lori is the child's maternal grandmother. Jeff and Lori are opposing parties in this matter, and they are not related to each other.
¶ 3. On September 21, 1992, S.L.M. ("the mother") gave birth to the child. During the pregnancy, the mother advised Jeff that either he or J.P. ("Jason") was the biological father of the child. A few months after the birth of the child, the mother and Jeff began living together with the child.
¶ 4. Jeff had a paternity test performed without court order by Scales Biological Laboratory. Unbeknownst to Jeff, the findings revealed that he was not the biological father. The mother altered the results to state that "[Jeff] is ACCEPTED as the father of [the child]" and presented those altered results to him. Jeff testified that he then believed that he was the father of the child and began contributing financial support to the mother and child. The couple lived together for approximately two and a half years and separated in July, 1995.
¶ 5. In November, 1995, Jeff filed for custody of the child. He and the mother subsequently entered into an agreed temporary order for joint legal and physical custody with equal periods of physical custody every forty-eight hours. Shortly after that order was entered, the mother was involved in a fatal automobile accident.
*1271 ¶ 6. After the mother's death, Lori, the child's maternal grandmother, and her husband, D.T. ("Derek") filed a notice of intervention in Jeffs custody action alleging that Jeff was not the biological father of the child. On June 19, 1996, Jeff filed a petition for termination of parental rights and for the adoption of the child and attached a consent and relinquishment of rights signed by Jason, who is the uncontested biological father. Jason testified that he signed the consent prior to the mother's death after repeated requests by her to do so. He has joined this appeal and now contends that he did not know he was the natural father of the child when he signed the consent and relinquishment of rights. However, he testified that he does not want custody of the child. He wants Lori to have custody.
¶ 7. In July, 1996, Jeff filed a motion for temporary relief as the only living parent of the child and requested the court to enter a final decree of adoption. Lori and Derek, the child's maternal grandparents, then filed a notice of intervention and cross petition for termination of parental rights and for adoption.
¶ 8. During the legal proceedings, Jeff took a job in the State of Georgia. Subsequently, an agreed temporary order was entered between him and Lori agreeing to joint legal custody of the child with Lori having primary physical custody.
¶ 9. The court appointed a guardian ad litem for the child and called for a neutral and independent therapist to evaluate the parties and to help the court determine the best interest of the child. Custody and adoption matters were consolidated for trial purposes.
¶ 10. During trial, the chancellor heard testimony on a motion filed by Jason, the biological father, to set aside his consent and relinquishment of parental rights. The court denied the motion for insufficient evidence of fraud or duress and found that the consent was voluntarily signed. On two separate occasions the court heard evidence on this issue and ruled in favor of the validity of the consent.
¶ 11. The independent therapist, Brenda Donald, testified that Jeff and the child relate and interact as father and daughter; that they have a strong bond to each other; and that Jeff is the emotional and psychological parent of the child. Donald found that the relationship between Lori and the child would potentially have psychologically damaging consequences for the child due to Lori's hostility toward Jeff and co-dependence on the child, among other reasons.
¶ 12. Dr. F.J. Eicke, a licensed psychologist, has counseled with Lori and the child since 1996. He testified that he gives primary credit to Lori for the child's ability to adjust to the circumstances of her situation. However, he also testified that he is not a custody or adoption evaluator and, thus, could not "determine what is in the best interest of this child with reference to [her] placement...."
¶ 13. The chancellor entered an adoption decree granting adoption to Jeff and Lori, who are opposing and non-related parties. Lori retains primary physical custody. Jeff alleges that he has now moved back to Mississippi, where he currently resides and is exercising visitation. Lori and Derek timely perfected this appeal.

ANALYSIS

I. WHETHER THE LOWER COURT ERRED IN DENYING THE MOTION OF THE BIOLOGICAL FATHER TO WITHDRAW HIS CONSENT TO ADOPT.
*1272 ¶ 14. Lori and Derek (collectively "the grandparents") argue that Jason, the biological father, should be allowed to withdraw his consent to adopt based on the assertion that this consent was procured through misrepresentation. Presumably since the grandparents do not have standing to assert Jason's rights, Jason has joined this appeal. The grandparents assert in their brief that Jason "was lied to by [Jeff] to secure his signature, i.e., that Jeff and [the mother] were getting married and that they were living together at the time, and that it was [her] wish."
¶ 15. Miss.Code Ann. § 93-15-103(2) (Supp.2000) states that the rights of a birth parent "may be relinquished and the relationship of the parent and child terminated by the execution of a written voluntary release, signed by the parent...." We have repeatedly held that a consent is valid and irrevocable unless the parent can establish either fraud, duress, or undue influence by clear and convincing evidence. See Grafe v. Olds, 556 So.2d 690 (Miss.1990); C.C.I. v. Natural Parents, 398 So.2d 220 (Miss.1981). We have also concluded that whether consent may be withdrawn is to be determined on a "case-by-case basis ... always keeping in mind that the best interest of the child is paramount." Grafe, 556 So.2d at 696.
¶ 16. On two separate occasions the chancellor upheld Jason's consent, finding no fraud, duress, or undue influence in the procurement of that consent. "This Court will not overturn a chancellor's findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong." Id. at 692.
¶ 17. It is undisputed that at the time the consent was given both Jason and the mother agreed to the adoption of the child by Jeff. Jason testified that he signed the consent and relinquished his rights at the request of the mother. Only after this litigation between Jeff and the grandparents ensued did Jason decide he wanted to take back his rights so that he could give those rights to the grandparents. He has not voiced an intention to keep parental rights himself. It is clear that he intends to avoid his own parental responsibilities. He testified expressly that he does not want custody of the child. He wants Lori to have custody. Jason's apparent intentions have been honored to the extent that Lori has become the adoptive mother of the child and has been granted primary custody. Jason has suffered no harm and proved no fraud.
¶ 18. The chancellor's findings are supported by substantial evidence. The chancellor did not commit manifest error in finding no fraud, duress, or undue influence in the procurement of the biological father's consent. We find no merit to this assignment of error.

II. WHETHER THE LOWER COURT ERRED IN ALLOWING THE TESTIMONY OF BRENDA DONALD.
¶ 19. The grandparents assert that Brenda Donald's testimony should not have been allowed because she was biased in Jeff's favor. The grandparents contend that this bias was evidenced through her heavy reliance on the information provided by Jeff and the child and her disregard of the information provided by the grandparents. Further, they assert that she ignored Dr. Eicke's reports and that she disregarded certain facts about Jeff, including his history of drug use, a drug conviction, and evidence of violence toward the mother.
¶ 20. In Murphy v. Murphy, 631 So.2d 812, 816 (Miss.1994), a child custody case, we stated that "the chancellor's duty is to determine what is in the best interest of *1273 the child. As such, chancellors should consider any and all evidence which aids them in reaching the ultimate custody decision." In J.C. v. Natural Parents, 417 So.2d 529, 531 (Miss.1982), we held that "[t]he chancery courts may order an investigation as to whether the prospective adopting parents are suitable for the child; however, such reports are certainly not conclusive on the courts if deemed not to be in the child's best interest."
¶ 21. The chancellor in the case sub judice appointed a guardian ad litem to select a therapist who was not connected to either party. The parties agreed to the order appointing the guardian ad litem and his instructions to procure an independent therapist to conduct the evaluation. The guardian ad litem stated in a letter to the court that Donald "has extensive experience in dealing with children of this age and under similar circumstances." We will not hold the chancellor in error for following the recommendations of a licensed, experienced, independent therapist procured by another independent party, the guardian ad litem.
¶ 22. The grandparents fail to cite any portion of the record indicating that Donald was actually biased against them and in favor of Jeff. Their attempts to show her bias prove to be inaccurate. For instance, they assert that Donald ignored certain facts regarding Jeff's history of drug abuse and his admitted violence toward the mother. The record indicates that Donald did not disregard this information, but, to the contrary, expressed concern about these facts. However, she went on to conclude, notwithstanding these certain concerns, that Jeff should be allowed to take an active role in the child's life. It appears to us that the grandparents deem Donald "biased" simply because she did not give them a report favorable to their interests.
¶ 23. The grandparents' primary desire appears to be that Jeff be excluded from the child's life. Otherwise, they would be satisfied with the chancellor's ruling giving them primary custody with visitation rights for Jeff. The chancellor stated, "The troubling prospect for which the Court cannot seem to find an adequate solution is the likelihood that, if allowed to adopt [the child], the grandmother would not foster, nor even allow, a continuing relationship between Jeff and [the child]." Neither Donald nor the chancellor found the exclusion of Jeff from the child's life to be in the best interest of the child.
¶ 24. The chancellor did not commit manifest error in considering Donald's testimony and reports. Thus, we find no merit to this assignment of error.

III. WHETHER THE OPINION AND JUDGMENT OF THE LOWER COURT CONSTITUTES AN ABUSE OF DISCRETION, MANIFEST ERROR, AND APPLICATION OF AN ERRONEOUS LEGAL STANDARD.
¶ 25. It is undisputed that all parties seeking to adopt the child in this case qualify under the technical aspects of the state's principal adoption statute, Miss. Code Ann. § 93-17-3 (Supp.2000). There is no requirement that the adopting parent be blood-related to the child. The only preferential treatment given to blood relatives under this statute is the waiver of the 90-day Mississippi residency requirement. Since both Jeff and Lori satisfy the statutory requirements, the primary focus of this issue should be the evaluation of the best interest of the child. This evaluation must be accomplished with deference to the chancellor's findings; for, absent manifest error, a chancellor's ruling will not be disturbed on appeal. See, e.g., Murphy, 631 So.2d at 815 (stating that, when substantial evidence supports the chancellor's findings, this Court will not disturb his *1274 conclusions, notwithstanding that this Court might have found otherwise as an original matter).
¶ 26. In Natural Mother v. Paternal Aunt, 583 So.2d 614, 619 (Miss.1991), we stated:
[T]he pre-eminent concern in cases involving custody of a child is the child's best interest. Ainsworth v. Natural Father, 414 So.2d 417 (Miss.1982); J.C. v. Natural Parents, 417 So.2d 529 (Miss. 1982); Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983). Factors to be considered in determining the child's best interest are stability of environment, ties between prospective adopting parents and children, moral fitness of parents, home, school and community record of the child. J.C. v. Natural Parents, and Albright v. Albright, supra.

¶ 27. In their brief, the grandparents point to another factor to be considered, quoting with emphasis our statement in Prante v. Beggiani, 519 So.2d 1208, 1212 (Miss.1988): "Kinship is ... a factor to be considered...." The grandparents cleverly abridged the quoted language of this Court. The unabridged version reads as follows: "Kinship is only a factor to be considered and is not determinative of the issue." Id. (emphasis added). Thus, the fact that Jeff is not kin to the child is not sufficient to find him unsuitable as a parent. As stated above, Jeff satisfies the requirements of Miss.Code Ann. § 93-17-3.
¶ 28. In determining what would be in the best interest of the child, the chancellor appears to have considered the factors enumerated above and the recommendations of the experts. It is important here to remember that the chancellor did not award primary custody to Jeff. While Jeff has been granted the right to adopt the child, he has, in effect, been given little more than the visitation rights that would be exercised by a typical divorced father. Therefore, the applicable factors listed above must not be reviewed on appeal solely in regard to Jeff. Indeed, it would be more crucial to analyze those factors in regard to the grandparents, since they have been awarded primary custody of the child and will, no doubt, have the most significant influence on her. We decline such analysis in this appeal, however, since Jeff does not contest the awarding of primary custody to the grandparents.
¶ 29. A review of the record satisfies us that the chancellor did not commit manifest error in determining that the best interest of the child is a joint adoption with primary custody awarded to the grandmother and visitation rights awarded to Jeff. Jeff has admitted a history of drug abuse, including an allegedly expunged drug-related conviction at the age of 19. He has also admitted to past acts of aggression toward the mother. Nevertheless, he has been evaluated by a licensed, experienced, independent court-appointed therapist who was aware of this information and still maintained that he should not be excluded from the child's life. The chancellor agreed with the therapist's opinion.
¶ 30. The chancellor's ruling is sensitive to the fact that the child has experienced significant loss in her lifethe death of her mother. He stated:
The Court is deeply concerned and feels most strongly, as does the Court's expert, that this young child does not need to experience any more loss in her life any time soon. As a natural grandparent, Lori would enjoy certain statutory rights should the Court award the adoption to Jeff; however, and most unfortunately, the present state of the law in this area renders the Court powerless to enforce a course of conduct clearly in *1275 this young child's best interest, that is, continued contact with the man she regards as her father, should Lori and Derek's adoption petition be granted.... The prevention of further loss and emotional turmoil in [the child's] life is what should be of paramount concern to us all at this point.
¶ 31. Justifying his decision to grant adoption to both Jeff and Lori, the chancellor quoted Justice Banks' separate opinion in Humphrey v. Pannell, 710 So.2d 392, 402 (Miss.1998), where Justice Banks stated, "[N]ot all adoptions are `traditional.' The chancellor is in the best position to assess this question with respect to each adoption on a case by case basis." We find that the chancellor in the case sub judice did not commit manifest error in granting this untraditional adoption. This assignment of error is without merit.

IV. WHETHER THE LOWER COURT ERRED IN DISALLOWING THE HYPOTHETICAL OF EXPERT DR. JOSEPH EICKE.
¶ 32. Prior to trial, the grandparents retained the services of Dr. Joseph Eicke, a psychologist, who counseled with Lori and the child. Lori testified that part of the reason she saw Dr. Eicke initially was "to stop the Georgia visitation" between Jeff and the child. The chancellor heard Dr. Eicke's lengthy testimony; however, Dr. Eicke did not testify as to what is in the best interest of the child in respect to placement in either the grandparents' home or Jeff's home.
¶ 33. The grandparents assert that Dr. Eicke's testimony was necessary because "[t]he statute requires the testimony (affidavit) of a doctor, which was not submitted as evidence in this case." The grandparents are mistaken about the statutory requirements. Miss.Code Ann. § 93-17-3 (Supp.2000) states: "The petition [for adoption] shall be accompanied by a doctor's or nurse practitioner's certificate showing the physical and mental condition of the child to be adopted...." Jeff complied with this element of the statute.
¶ 34. A doctor's testimony is not required by statute, as asserted by the grandparents. Nevertheless, Dr. Eicke's testimony was heard by the chancellor. It is a specific omission from this testimony that is apparently of concern to the grandparents and is the topic of this assignment of error. That is, Dr. Eicke did not testify as to what is in the best interest of the child in respect to placement in either the grandparents' home or Jeff's home. The grandparents address this issue as the chancellor's error, when, in fact, Dr. Eicke took the initiative in the matter by refusing to testify on this point since he had not evaluated all the parties involved. The following exchange took place between Dr. Eicke and the chancellor:
Dr. Eicke: And the prevailing standard is that a person would evaluate the totalall the individuals involved, and I have not done that. I mean, I fullyI fully recognize that I have not had contact other than on one brief occasion
The Court: And that's the prevailing so I understand, that's the prevailing standard to enable someone insituated as you are, qualified as you are, to express an opinion about custody issues. Is that what you're saying?
Dr. Eicke: That's right.
The Court: And you have not followed that standard yourself in this case because you have not talked to all of the parties. Is that what you're saying?
Dr. Eicke: That's right.
Later, Dr. Eicke testified as follows:
Ms. Milner: And so that we can get the roles straight here, you are in a therapy position, meaning you have been seeing the child as a therapist; right?

*1276 Dr. Eicke: Yes.
Ms. Milner: Not a custody evaluator, not an adoption evaluator, not to determine what is in the best interest of this child with reference to a placement in either the [grandparents'] home or [Jeff's] home; right?
Dr. Eicke: That's right.
Ms. Milner: And, in fact, you are precluded by doing that if you're going to abide by the guidelines that are in your profession?
Dr. Eicke: I think I have purposely avoided making any statements about [the adoptive father] without some reference to statements made to me or such.
* * *
Ms. Milner: And the person that is best ableat least according to the guidelines, is best able to determine when a custody change should occur or an adoption is a person who has seen all parties; correct?
Dr. Eicke: That's what I've testified to, and that's what I adhere to.
¶ 35. The grandparents attempted to circumvent Dr. Eicke's inability to give an opinion on this issue by posing a hypothetical question which was inappropriately phrased and did not pass muster according to the chancellor. Counsel for the grandparents asked Dr. Eicke to base part of his opinion on his actual knowledge and experience with the parties he had evaluated and the remaining part on a hypothetical specific to Jeff, whom he had not evaluated. The chancellor sustained Jeff's objection and informed the grandparents' attorney that "it's all or nothing" when posing hypothetical questions.
¶ 36. The grandparents assert that the chancellor abused his discretion in not allowing a hypothetical. Such methods of eliciting expert testimony are permitted in this state. See, e.g., Gray v. State, 728 So.2d 36 (Miss.1998). However, we will not permit the use of ill-phrased hypothetical questions as a means of circumventing a chancellor's sound ruling disallowing inadmissible testimony. Such is what the grandparents attempted to do here.
¶ 37. Further, even if the chancellor did abuse his discretion in this matter, the error was harmless. Dr. Eicke was allowed to testify as follows:
Mr. Buchanan: Okay. Just so we don't misunderstand each other, my question is your opinion as to whether or not [the grandparents] are suitable as adoptive parents for this child.
* * *
Dr. Eicke: I would restate my previous statement, that, in my opinion, the [grandparents] are more than adequate as parents for this young child and have done what I consider to be an admirable job to this date.
Thus, though Dr. Eicke was unable to compare the grandparents' parenting capabilities to Jeff's, he was, nonetheless, allowed to give an opinion placing the grandparents in a favorable light. And, in fact, the chancellor granted adoptive rights to the grandmother and physical custody to the grandparents. This fact indicates that the chancellor gave considerable weight to Dr. Eicke's opinion. It also indicates that the purposes of the proposed but disallowed hypothetical were primarily accomplished in the end. That is, the grandparents were able to convince the chancellor that they were the better choice for placement of the child. They were unable to convince him, however, that they should be the sole parties to adopt the child.
¶ 38. For the foregoing reasons, any error committed by the chancellor was *1277 harmless. We find no merit to this assignment of error.

CONCLUSION
¶ 39. The record in the case sub judice clearly reveals that the chancellor placed paramount concern on the best interest of the child and arduously and compassionately deliberated over the circumstances of the parties involved. Though the chancellor's ruling may be untraditional, the chancellor is correct. Chancellor Singletary stated in his opinion:
The cold stark form of the law would have ended this matter long ago, but the Court has agonized over its duty to act in the best interest of this little girl. Knowing that the Supreme Court, if called upon to review this matter, would no doubt look askance at the remedy fashioned, the Court nevertheless takes comfort in knowing as well that they are cognizant of the unique position the Chancellor is in to learn the parties and their circumstances, to assess their credibility and the weight to be given the evidence, and to balance the equities and determine what is in the best interest of the minor child.
¶ 40. We have no doubt that the chancellor acted in the best interest of the child in this case. We do not find any abuse of discretion or manifest error on his part. Consequently, the judgment of the Chancery Court of the First Judicial District of Hinds County is affirmed.
¶ 41. AFFIRMED.
PITTMAN, C.J., BANKS, P.J., SMITH, WALLER AND DIAZ, JJ., CONCUR. McRAE, P.J., COBB AND EASLEY, JJ., CONCUR IN RESULT ONLY.
NOTES
[1] Pursuant to Miss.Code Ann. §§ 93-17-25, 29 & -31 (1994), fictitious names are used for the parties to maintain confidentiality.