# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-01530-SCT

***THE MATTER OF THE ADOPTION OF THE***
***CHILD DESCRIBED IN THE PETITION: D.D.H.,***
***PATRICK LATRELL GRAY AND FELICIA***
***HANNAH DOTCH***

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/2016 |
| TRIAL JUDGE: | HON. JOSEPH KILGORE |
| TRIAL COURT ATTORNEY: | JOHN M. GILMORE |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JOHN M. GILMORE |
| ATTORNEY FOR APPELLEE: | NO BRIEF FILED |
| NATURE OF THE CASE: | CIVIL - ADOPTION |
| DISPOSITION: | REVERSED AND REMANDED - 01/11/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. Patrick Latrell Gray and Felecia Hannah Dotch petitioned the Attala County Chancery Court to allow Gray to adopt D.D.H. without terminating Dotch's parental rights. After consideration, the chancellor denied the petition. Aggrieved, Gray and Dotch appeal, arguing that their due-process and equal-protection rights were infringed.

¶2. After review, we reverse. The chancellor erred, as a matter of law, in finding that Mississippi Code Sections 93-17-3(4) and 93-17-13(2) (Supp. 2017) bar the adoption. As D.D.H.'s adoption by Gray is not barred by statute, it is unnecessary for this Court to perform

a constitutional analysis of Sections 93-17-3(4) and 93-17-13(2).

**STATEMENT OF FACTS**

¶3.     On August 21, 2003, Dotch gave birth to a daughter, D.D.H.  Dotch and Gray have never been married, and only Dotch is listed on D.D.H.'s birth certificate.  Near the time of D.D.H.'s conception, however,  Dotch and Gray were in a romantic relationship, and both believed that Gray was D.D.H.'s father.  Early in her life, D.D.H. lived with Gray and Gray's mother.  When D.D.H. was old enough to attend school, she began to live with Dotch.  During this time, Gray exercised visitation with D.D.H. and continued to provide financial support to her.

¶4.     More than a decade after D.D.H's birth, Gray discovered that he was not her biological father.  After this, Gray continued to visit and support D.D.H.  The identity of D.D.H.'s biological father is not known.  Currently, Gray and Dotch both are married to other people.

¶5.     Upon discovering that Gray was not D.D.H.'s biological father, Gray and Dotch petitioned the Attala County Chancery Court to allow Gray to adopt D.D.H.  In the petition, the parties requested that Gray be allowed to adopt D.D.H. and Dotch be allowed to retain "care, custody, and control" of D.D.H.  Gray and Dotch claimed that the adoption was in D.D.H.'s best interest.

¶6.     At a hearing on the petition, the chancellor denied the petition for adoption under Mississippi Code Sections 93-17-3(4) and 93-17-13(2).  In denying the petition, the

chancellor stated, "I think it may be [in] the child's best interest to be adopted. I think this statute ties my hands . . . ."[1] The order denying the petition (1) recognized that Gray had failed to join his wife, Shannon Gray, in the petition as required by Section 93-17-3(4), and (2) found that the petition's request that Dotch's parental rights not be terminated by the final decree was inconsistent with Section 93-17-13(2). The order also stated "that although the Court may agree that it would be in the best interest of the minor child sought to be adopted, this Court is bound by the legislative requirement as found in Mississippi 93-13-1, *et seq.*, and therefore, the Petition for Adoption, should be, and it hereby is, DENIED."

¶7. After denying the petition, the chancellor allowed an offer of proof. Dotch testified that D.D.H. was "very strongly attached to [Gray] because he's the only father that's been in her life and been doing for her." She also stated that "when [D.D.H.] was younger, she spent more time with [Gray and Gray's mother] than she did with me. . . . She cares a lot for him." Dotch also stated that Gray had always held himself out as D.D.H.'s father. Dotch maintained that she wanted to retain her parental rights after Gray's adoption of D.D.H. Gray testified that he had a "[g]ood" relationship with D.D.H. and that he had supported her financially since birth. Gray maintained that D.D.H. regularly visited him on two weekends out of each month. He also testified that his wife and D.D.H. "get along good [sic]."

¶8. Gray and Dotch both appeal the denial of the petition. On appeal, they maintain that

---

[1] The chancellor recognized that "the unknown natural father was served in the manner required by law and was called in open court and did not appear."

3

Sections 93-17-3(4) and 93-17-13(2) violate their due-process rights under the United States and Mississippi Constitutions and their equal-protection rights under the United States Constitution. Gray and Dotch also assert that the denial of the petition violates D.D.H.'s equal-protection rights under the United States Constitution. Gray and Dotch properly served a copy of their brief on the Attorney General under Mississippi Rule of Appellate Procedure 44(a). M.R.A.P. 44(a). The deadline for the Attorney General to respond to the brief has passed. *See* M.R.A.P. 44(b).

## STANDARD OF REVIEW

¶9. Statutory interpretation is a matter of law which we review de novo. ***5K Farms, Inc. v. Mississippi Dep't of Revenue***, 94 So. 3d 221, 225 (Miss. 2012) (citing ***Ameristar Casino Vicksburg, Inc. v. Duckworth***, 990 So. 2d 758, 759 (Miss. 2008)). Further, "[t]he constitutionality of a statute will not be determined unless absolutely necessary to determine the merits of the litigation in which the constitutional issue has been presented." ***Roberts v. Mississippi State Highway Comm'n***, 309 So. 2d 156, 160 (Miss. 1975).

## ANALYSIS

¶10. Today, we need not reach the constitutional claims before us. Instead, we begin with an analysis of the plain-language meaning of the statutes at issue. As discussed below, this analysis will determine the merits of the appeal without violating any of the petitioners' constitutional rights.

    **I.**    **The plain language of Sections 93-17-3 and 93-17-13 permits Gray to adopt D.D.H. without terminating Dotch's parental rights.**

4

¶11.    The Court's role "is not to decide what a statute should provide, but to determine what it does provide." *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011). "If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." *Id*. If a statute is "ambiguous or silent," statutory interpretation is warranted. *Mississippi Methodist Hosp. & Rehab. Ctr., Inc. v. Mississippi Div. of Medicaid*, 21 So. 3d 600, 607 (Miss. 2009). When presented with statutes that are plain and unambiguous, the Court's directive is clear, "[T]he Legislature shall be deemed to have intended to mean what they have plainly expressed, and, consequently, no room is left for construction in the application of such a law." *Wilson v. Yazoo & M.V.R. Co.*, 6 So. 2d 313, 314 (Miss. 1942). "'[C]ourts are without the right to substitute their judgment for that of the Legislature as to the wisdom and policy of the act and must enforce it, unless it appears beyond all reasonable doubt to violate the Constitution.'" *5K Farms, Inc.*, 94 So. 3d at 227 (quoting *Pathfinder Coach Div. of Superior Coach Corp. v. Cottrell*, 62 So. 2d 383, 385 (Miss. 1953)).

¶12.    However, "the ultimate goal of this Court is to discern the legislative intent." *Mississippi Methodist Hosp. & Rehab. Ctr., Inc.*, 21 So. 3d at 607. "To determine legislative intent, the Court first looks to the language of the statute." *Lawson*, 75 So. 3d at 1027. "The intention and purpose of the Legislature is to be deduced from the whole and every part of the statute taken together—from the words and context—and such a construction adopted as will best effectuate the intention of the law-giver." *Wilson*, 6 So.

5

2d at 314. Further, "the Court may also look to the statute's historical background, purpose, and objectives." *Lawson*, 75 So. 3d at 1027.

### A. Mississippi Code Section 93-17-3

¶13. The first section to consider is Section 93-17-3(4). Section 93-17-3(4) provides in pertinent part that "[a]ny person may be adopted in accordance with the provisions of this chapter in termtime or in vacation by an unmarried adult or by *a married person whose spouse joins in the petition.*" Miss. Code Ann. § 93-17-3(4) (emphasis added). The petitioners argue that Gray's wife should not have to join the petition, and the statute "limits the rights of a married person to adopt without his/her spouse being joined as a party to the adoption."

¶14. Section 93-17-3(4) sets out requirements for an adoption, detailing the jurisdiction and venue for adoption proceedings and detailing the petition's requirements—such as the joinder of both spouses when married and a doctor's or nurse practitioner's certificate of the health of the child. Miss. Code Ann. § 93-17-3(4). The section also governs home studies for adoptions, changing the child's name, and additional considerations for jurisdiction. *Id.*

¶15. Section 93-17-3 is unambiguous. The requirements are clear, and we see no reason why they should not be followed in the instant case. Simply put, Gray's spouse must join him in his petition to adopt D.D.H. Miss. Code Ann. § 93-17-3(4). The plain language of Section 93-17-3(4) does not provide that the joinder of Gray's spouse means that she will

6

receive any custodial or parental rights[2] or that she is adopting the child. It requires only that she join in Gray's request.

¶16. In an adoption proceeding, the best interests of the child are paramount, and the Court reviews adoptions to ensure the chancellor considered the best interests of the child. *In re Adoption of D.N.T.*, 843 So. 2d 690, 706 (Miss. 2003); *In re Adoption of P.B.H.*, 787 So. 2d 1268, 1277 (Miss. 2001). The requirement to include the spouse on the adoption petition, even if the spouse is not the adopting party, enables the best interests of the child to be served. If the spouse is joined, the chancellor would then have the opportunity to consider and, if needed, question the spouse who regularly would be in the adopted child's life as a step-parent. Further, requiring the spouse to join provides the spouse notice of the adoption petition—as the final decree could possibly affect the spouse's rights and the inheritance rights of the spouse's children. Therefore, Section 97-13-3(4)'s requirement to include Gray's spouse in the adoption proceeding ensures that the best interests of D.D.H. are considered and should be followed in this case.

### B.    Mississippi Code Section 93-17-13

¶17.    The second section before us is Section 93-17-13(2), which explains the effect of the final adoption decree. It states:

> (2) The final decree shall adjudicate, *in addition to such other provisions as may be found by the court to be proper for the protection of the interests of the child*; and its effect, *unless otherwise specifically provided*, shall be that (a) the

---

[2]Gray's wife would merely assume the role of step-parent.

child shall inherit from and through the adopting parents and shall likewise inherit from the other children of the adopting parents to the same extent and under the same conditions as provided for the inheritance between brothers and sisters of the full blood by the laws of descent and distribution of the State of Mississippi, and that the adopting parents and their other children shall inherit from the child, just as if such child had been born to the adopting parents in lawful wedlock; (b) the child and the adopting parents and adoptive kindred are vested with all of the rights, powers, duties and obligations, respectively, as if such child had been born to the adopting parents in lawful wedlock, including all rights existing by virtue of Section 11-7-13, Mississippi Code of 1972; provided, however, that inheritance by or from the adopted child shall be governed by paragraph (a) above; (c) that the name of the child shall be changed if desired; and (d) that the natural parents and natural kindred of the child shall not inherit by or through the child except as to a natural parent who is the spouse of the adopting parent, *and all parental rights of the natural parent, or parents, shall be terminated*, except as to a natural parent who is the spouse of the adopting parent. Nothing in this chapter shall restrict the right of any person to dispose of property under a last will and testament.

Miss. Code Ann. § 93-17-13(2) (emphasis added). The petitioners maintain that Section 93-17-13(2) "limits the rights of a natural parent to retain his/her parental rights and allow the adoption of a child by a person that has a meaningful relationship with that child."

¶18.    Section 93-17-13(2) provides the general effect of the final adoption decree. Further, the first part of the statute notes the paramount concern in an adoption: the best interests of the child. It states that the final decree may contain "provisions as may be found by the court to be proper for the protection of the interests of the child . . . ." Miss. Code Ann. § 93-17-13(2). It also states the effect of the final decree "*unless otherwise specifically provided*." *Id*. (emphasis added). Thus, Section 93-17-13(2) makes it clear that the effect of the final adoption decree can be tailored by the chancellor if found to be in the child's best interest. The Court has addressed the discretion of a chancellor to modify a final adoption decree

8

under the language of Section 93-17-13(2), and although the cases are not completely analogous factually, they provide guidance to the instant issue.

¶19.    In *Humphrey v. Pannell*, 710 So. 2d 392 (Miss. 1998), the grandparents of a child successfully adopted the child.  Subsequently, more than five years after the adoption,[3] the parental rights of the natural father, Larry Joe Humphrey, were recognized and considered not terminated by the decree.  *Id*. at 399.  Two years later, Humphrey filed a complaint to set aside the adoption of the child by the grandparents and to modify custody of the child.  *Id*. at 394.  The chancellor denied the motion to set aside the adoption and to modify the custody.  *Id*. at 395.  Humphrey appealed.  *Id*.  The Court affirmed.  *Id*. at 401.

¶20.    First, it upheld the chancellor's refusal to set aside the adoption.  *Id*. at 398.  The Court then analyzed the modification of custody under the material-change-of-circumstances standard.  *Id*. at 399–400.  Noting the unique factual scenario, where the child had been adopted but the natural father had retained his parental rights, the Court stated that Humphrey's retainment of "*all* of his parental rights" would render the adoption meaningless.  *Id.* at 399 (emphasis in original).  The Court then concluded that, under a material-change-of-circumstances standard, Humphrey could divest the grandparents of custody of their adopted child which "comes dangerously close to terminating the Pannells' parental rights on the basis of a preponderance of the evidence standard which was rejected by this Court,

---

[3]The father was aware of the adoption within months of its occurrence, but contested the adoption only five years later.  *Humphrey*, 710 So. 2d at 392.

the Legislature, and the U.S. Supreme Court." *Id*. at 399. In support of this conclusion, the Court then turned to the permanence of adoption, and it dubbed the adoption at issue a "quasi-adoption" due to Humphrey's retainment of his parental rights. *Id*. at 400.

¶21. The Court then considered the "unless otherwise specifically provided" language of Section 93-17-13(2). *Id*. at 399-400. It stated that in some states that language allows post-adoption visitation, which differs from a quasi-adoption. *Id*. at 400. It concluded that Section 93-17-13(2)

> was not intended by the Legislature to grant a natural parent the right to weaken the legal bonds of the adoptive parent-child relationship by reserving the right to, in effect, sit and wait for the circumstances of the adoptive family to materially change and then divest the adoptive family of custody.

*Id*. In other words, the "unless otherwise specifically provided" language does not extend to allow a "quasi-adoption" wherein a child is adopted—in *Humphrey* by her grandparents—and the father retains *all* of his parental rights. The Court then held that although the agreed decree granting Humphrey parental rights was upheld, Humphrey was entitled only to visitation. *Id.* at 401. In short, he could not succeed in a custody battle.

¶22. Three years after *Humphrey*, the Court upheld a "joint adoption" or a nontraditional adoption. *In re Adoption of P.B.H.*, 787 So. 2d 1268, 1274 (Miss. 2001). In *In re P.B.H.*, the maternal grandparents filed for adoption of the child, and the mother's[4] former cohabitant, Jeff, also filed for adoption of the child. *Id*. at 1270. Jeff had believed he was

---

[4]The mother had passed away. *In re P.B.H.*, 787 So. 2d at 1270.

10

the father of the child for three years after the child's birth. *Id*. When Jeff filed his petition for adoption, he attached a consent and relinquishment of rights signed by the biological father. *Id*. at 1271. The chancellor granted the adoption to the grandmother, Lori, and to Jeff. *Id*. On appeal, the Court stated that the adoption satisfied the statutory requirements; therefore, it viewed the adoption through the lens of whether it was in the best interests of the child. *Id*. at 1273. The Court upheld the chancellor's decision, noting the language quoted by the chancellor in his decree, "[N]ot all adoptions are 'traditional.' The chancellor is in the best position to assess this question with respect to each adoption on a case by case basis." *Id.* at 1275 (quoting *Humphrey*, 710 So. 2d at 402) (Banks, J., concurring in part and dissenting in part)).

¶23.    In 2002, the Court again spoke on the "unless otherwise specifically provided" language. The Court held, citing *Humphrey* as guidance, that "unless otherwise specifically provided" does not allow for post-adoption visitation. *In re Adoption of J.E.B.*, 822 So. 2d 949, 953 (Miss. 2002).

¶24.    Although none of the above-cited cases speaks to the issue in the instant case, the three cases provide us with some guidance. Under *Humphrey*, the "unless otherwise specifically provided" language does not allow a "quasi-adoption," wherein  a third party, aside from *someone adopting as the mother* and *someone adopting as the father*, retains *all* his parental rights. *See Humphrey*, 710 So. 2d at 401. In *In re P.B.H.*, the best interests of the child allowed a joint adoption or a nontraditional adoption between *someone adopting*

11

*as the mother* and *someone adopting as the father*. ***In re P.B.H.***, 787 So. 2d at 1275. Notably, in ***In re P.B.H.***, although the grandfather filed for adoption, adoption was not granted to him. ***Id.*** at 1270. Subsequently, under ***In re J.E.B.***, the "unless otherwise specifically provided language" was limited as not allowing post-adoption visitation. ***In re J.E.B.***, 822 So. 2d at 953.

¶25. Here, Gray is seeking to adopt *as the father*, and Dotch seeks to keep her natural parental rights *as the mother*. Therefore, ***Humphrey*** is distinguishable. Here, there is no third party; therefore, there is no quasi-adoption by a third party to the adoption seeking to exercise his or her natural parental rights at the expense of the adopting mother and father. Further, unlike ***In re J.E.B.***, there is no third party seeking post-adoption visitation rights.

¶26. The instant adoption is more in line with the holding in ***In re P.B.H.*** If determined by the chancellor to be in best interests of the child, the instant adoption would be joint and nontraditional with Gray adopting *as the father* and the natural mother retaining her rights *as the mother*. Further, as shown by ***In re P.B.H.***, Section 93-17-13(2) does not prevent the adoption. In fact, Section 93-17-13(2) grants the chancellor the authority to grant the adoption by noting the importance of the best interests of the child and by providing "unless otherwise specifically provided." *See* Miss. Code Ann. § 93-17-13(2).

¶27. Gray has been in D.D.H.'s life since her birth, acting as a natural parent and providing support and care for her. Even upon learning that he was not the natural father, Gray continued to fulfill the role of father in her life. As such, he has been acting "in loco

12

parentis." ***Griffith v. Pell***, 881 So. 2d 184, 186 n.1 (Miss. 2004) ("A person acting in loco parentis is one who has assumed the status and obligations of a parent without a formal adoption.").[5] Further, the chancellor noted in the record that the adoption "could be [in] the best interests of the child" and later that it "may be [in] the child's best interest."

¶28.    Under the facts of the instant case, if the chancellor—on remand—makes a finding that the adoption *is* in the best interests of D.D.H., the "otherwise specifically stated" language of Section 93-17-13(2) allows Gray to adopt the child and allows Dotch to keep her parental rights.  Our holding is narrowly tailored to the following facts: (1) Gray has acted in loco parentis; (2) he is seeking to adopt and would be adopting as the father; (3) he is seeking to raise the child in concert with Dotch, the natural mother; (4) his spouse will be joined to the proceeding, and (5) there are no third parties to the adoption seeking to keep parental rights.[6]

¶29.    Further, our holding is based upon the ultimate goal of the Court in adoption proceedings to keep the best interests of the child in the forefront.  As we have recognized in the past, "[n]ot all adoptions are 'traditional.'  The chancellor is in the best position to assess this question with respect to each adoption on a case by case basis." ***In re P.B.H.***, 787

---

[5]Also, "[a]ny person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child is said to stand in loco parentis." ***Griffith***, 881 So. 2d at 186 n.1 (internal quotation omitted).

[6]We also note that the biological father was properly served and failed to exercise his rights.  The chancellor found that "the unknown natural father was served in the manner required by law and was called in open court and did not appear."

So. 2d at 1275.

¶30.    This is the situation that we, as a Court, hope to see: a child who has a nonbiological father who has continued to care for her—despite his knowledge of the lack of biological kinship—and now wishes to recognize legally his bond with his daughter.  We have stated: "[P]arental status that rises to the level of a constitutionally protected liberty interest does not rest solely on biological factors, but rather, is dependent upon an actual relationship with the child where the parent assumes responsibility for the child's emotional and financial needs." *Griffith*, 881 So. 2d at 186–87.

II.    **Because Sections 93-17-3 and 93-17-13 allow the adoption, it is unnecessary to consider the petitioners' constitutional claims**.

¶31.    "The constitutionality of a statute will not be determined unless absolutely necessary to determine the merits of the litigation in which the constitutional issue has been presented." *Roberts*, 309 So. 2d at 160.  *See **W. Line Consol. Sch. Dist. v. Greenville Mun. Separate Sch. Dist.***, 433 So. 2d 954, 957 (Miss. 1983) ("[I]f it is not necessary to rule upon the constitutionality of a statute, it is necessary that a court not rule upon it."); ***Mitchell v. State***, 127 So. 2d 394, 394 (Miss. 1961); ***Town of Flora v. Am. Express Co.***, 45 So. 149, 150 (Miss. 1907); ***Hendricks v. State***, 79 Miss. 368, 30 So. 708, 709 (1901); ***Adams v. Capital State Bank***, 20 So. 881, 882 (Miss. 1896) (noting that the Court is "constrained by our sense of duty to deny" a request to decide a constitutional question that is unnecessary to the resolution of the litigation).

¶32.    Further, there is a strong presumption that legislative enactments are valid and

14

constitutional. ***State ex rel. Hood v. Louisville Tire Ctr., Inc.***, 55 So. 3d 1068, 1072 (Miss. 2011) ("[W]e will strike down a statute only when it appears beyond a reasonable doubt that it violates the constitution"). "Legislatures are the voice of the people, charged with the responsibility of enacting statutes for the inhabitants of our State. They are a separate and co-equal branch of our three-part government: Executive, Legislative, and Judiciary." ***W. Line Consol. Sch. Dist.***, 433 So. 2d at 957–58. Indeed, "legislators . . . take[] the same oath as have we to uphold and support the Constitution." ***Burrell v. Mississippi State Tax Comm'n***, 536 So. 2d 848, 858 (Miss. 1988), *overruled on other grounds by* ***Commonwealth Brands, Inc. v. Morgan***, 110 So. 3d 752 (Miss. 2013).

¶33. Because the Court turns to constitutional issues only when necessary, we choose not to address them today. If the chancellor finds the adoption to be in the best interests of D.D.H, Section 93-17-3(4) enables Gray's wife to join the petition, and Section 93-17-13(2) grants the chancellor authority to permit D.D.H.'s adoption by Gray without terminating Dotch's parental rights. Given that none of the petitioners' constitutional rights will be infringed, a constitutional analysis is not merited.

**CONCLUSION**

¶34. Upon remand, Gray's spouse must join the petition for adoption, in writing, pursuant to Section 93-17-3(4). After she does so, if the chancellor finds the adoption to be in the best interests of D.D.H, Section 93-17-13(2) enables him to grant the petition for adoption and issue a final decree that does not terminate Dotch's parental rights. Thus, we reverse the

15

judgment of the trial court and remand for further proceedings consistent with this opinion.

¶35.    **REVERSED AND REMANDED.**

      **WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, BEAM AND ISHEE, JJ., CONCUR.**